**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES LENOIR (R62907), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 14 C 2376 |
| v. | ) | |
| | ) | |
| TARRY WILLIAMS, Warden, Stateville | ) | |
| Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Before the Court is pro se Petitioner James Lenoir's amended petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254(d). For the following reasons, the Court denies Lenoir's habeas petition. Further, the Court declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).[1]

**BACKGROUND**

When considering habeas petitions, federal courts must presume that the factual findings made by the last state courts to decide the case on the merits are correct unless the habeas petitioner rebuts those findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Ford v. Wilson,* 747 F.3d 944, 947 (7th Cir. 2014). Where Lenoir has not provided clear and convincing evidence to rebut this presumption of correctness, the following factual background is based on the Illinois Appellate Court's factual findings in *People v. Lenoir,* 1-07-1854 (1st Dist. Dec. 17, 2010) (unpublished), and the post-conviction Circuit Court of Cook County in

---

[1] Petitioner's reply brief was due on or before January 30, 2015. To date, Petitioner has failed to file his reply brief.

*People v. Lenoir,* 04-CR-0151701 (Ill. Cir. Ct. March 8, 2012) (unpublished).

**I.      Factual Background**

On September 18, 2003, police arrested Lenoir at his mother's home in connection with the murder of Deonte Wright and attempted murder of Jose Perez that took place on September 16, 2003, near the intersection of Western Avenue and Madison Street in Chicago, Illinois. After his arrest, Lenoir gave a videotaped statement to the police describing his involvement in the shooting. Thereafter, the State charged Lenoir and his co-defendants, Donald Phillips, Leondray McClennan, and Earl Faber, with first degree murder and attempted murder.

**A.      Motions to Suppress**

**1.      First Suppression Motion and Hearing**

Prior to his jury trial, Lenoir filed a motion to quash his arrest and suppress evidence claiming that his arrest was illegal because it was made without the authority of a search or arrest warrant in violation of *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Numerous individuals testified at the suppression hearing, including individuals who were present at the time of Lenoir's arrest on September 18, 2003. Testimony revealed that Lenoir's mother, Linda Cosby, lived at 2319 West Jackson Boulevard in Chicago. Cosby testified that on September 18, 2003, she was inside her home with about ten family members for a party. She further testified that she was upstairs when the police officers entered her home. Other individuals who testified at the suppression hearing stated that they were downstairs and that the police did not show them a warrant for Lenoir's arrest nor did they "knock and announce" when entering Cosby's home.

Chicago Police Detective Thomas Flaherty also testified at the suppression hearing, stating that he was working on the investigation of Wright's murder with other officers at Area 4 police headquarters. On September 18, 2003, another detective informed Detective Flaherty that Lenoir's co-defendant McClennan had given a statement implicating Lenoir in Wright's murder. After receiving this information, Detective Flaherty testified that he and other police officers went to 2319 West Jackson Boulevard to arrest Lenoir. He stated that the front door of the house was open, but the screen door was closed. He and the other officers then walked to the screen door and identified themselves as police officers. Detective Flaherty testified that he heard someone from inside say "come on in." The person asked the officers what they wanted, to which Detective Flaherty responded that he was looking for Lenoir. The police officers then arrested Lenoir.

After the suppression hearing, the Circuit Court judge concluded that the police had probable cause to arrest Lenoir and that there was no *Payton* violation. In particular, the Circuit Court concluded that—after listening to the witnesses and observing their demeanor—Detective Flaherty's testimony was clear and convincing that the police officers were invited into Cosby's home.

### 2.    Second Suppression Motion and Hearing

Lenoir also filed another motion to suppress prior to his jury trial in which he alleged that during his interrogation, he was subjected to various forms of physical and mental coercion, including being tightly handcuffed to a wall, beaten with a phone book, and held without food for over twenty-four hours. Lenoir also alleged that the police did not give him *Miranda* warnings prior to the start of his interrogation and that the police denied his request for a lawyer.

At the hearing on the second suppression motion, the State called Detective Flaherty, Detective Michael McDermott, and Assistant State's Attorney ("ASA") Catherine Gregorovic to testify. Detective Flaherty testified that he interviewed Lenoir in the early morning hours of September 19, 2003, and that Detective McDermott and ASA Gregorovic interviewed Lenoir in the late afternoon of September 19, 2003. Detectives Flaherty and McDermott, along with ASA Gregorovic, denied all of Lenoir's allegations. In addition, ASA Gregorovic had taken Lenoir's videotaped statement and the State played the statement for the judge to show Lenoir's physical appearance and mannerisms. The Circuit Court found the State's witnesses credible and denied Lenoir's second motion to suppress.

**B.     Trial Testimony**

During Lenoir's August 2006 jury trial, the State's primary witness was Lenoir's co-defendant Donald Phillips. At trial, Phillips testified that on September 16, 2003, co-defendant Leondray McClellan's cousin, Robert, was shot outside of Lenoir's house on West Jackson Boulevard at the St. Stephens Terrace apartments. According to Phillips, the Vice Lords street gang controlled this area. Phillips testified that he was a member of the Four Corner Hustlers, a street gang affiliated with the Vice Lords, that co-defendant Earl Faber was a member of the Traveling Vice Lords, and that Lenoir was a member of the Black Disciples street gang. Despite their membership in rival gangs, Lenoir and Phillips were friends because they lived and grew up in St. Stephens Terrace.

After Robert's shooting, Lenoir agreed to drive Phillips and Faber to the hospital to visit Robert. Phillips testified that after visiting the hospital, the group planned to retaliate against the Black Disciples for shooting Robert. Phillips further testified that he and Farber were carrying

guns. After Lenoir picked up co-defendant McClellan, the group was at the intersection of

Oakley Boulevard and Madison Street where they identified a pair of Black Disciples who

Phillips knew. The group agreed to "get them" and Lenoir drove westbound toward them

through an alley. As the group exited the alley onto Western Avenue, Lenoir saw the victim

Deonte Wright exiting a Walgreens store near the intersection of Western Avenue and Madison

Street. Phillips testified that Lenoir identified Wright as a member of the Black Disciples, after

which Faber asked Lenoir if he was sure. Lenoir responded "I'm sure man; I know what I'm

talking about." Lenoir then stopped the car near the front of the alley, and Faber exited the car

followed by Phillips.

At that time, Faber approached Wright and started shooting, after which Wright ran onto

Western Avenue and collapsed. Faber stood over him and shot him again. Phillips and Faber

then ran toward the alley where Lenoir and McClellan were waiting inside the car. Phillips

slipped and fell as he ran to the car. Phillips testified that Faber then got into the car and left the

scene with Lenoir and McClellan, but without him. Phillips ran to St. Stephens Terrace where

he reconnected with the group on the seventh floor of one of the apartment buildings. Phillips

testified that when they were on the seventh floor, he saw Faber remove shells from his gun.

The group then agreed not to talk about the murder with anyone and then separated.

On cross-examination, Phillips acknowledged that he entered into a plea agreement with

the State in exchange for his testimony against Lenoir. Also on cross-examination, counsel tried

to establish that Lenoir did not drive Faber to St. Stephens Terrace after Wright's shooting. To

that end, defense counsel asked Phillips whether he had previously told the police that he and

Faber went back to St. Stephens Terrace together, but Phillips denied making any such

statement.    The other shooting victim, Jose Perez, also testified at Lenoir's jury trial.  He

stated that on September 16, 2003, he was driving north on Western Avenue to a friend's house.

Perez testified that he stopped for a traffic light at the intersection of Western Avenue and

Madison Street.  He stated that he felt something very hot on his forehead and then lost

consciousness.  He awoke in the Cook County Hospital after undergoing surgery to remove a

bullet from his head.

At trial, the State published Lenoir's videotaped statement to the jury.  In his statement,

Lenoir recounted the shooting of McClellan's cousin, Robert, who was Lenoir's friend.  Lenoir

stated that he did not witness Robert's shooting, but saw a man with a gun in his hand enter a

white Ford Crown Victoria and take off.  Lenoir stated that he knew the car was associated with

the Black Disciples.  After Robert was transported to the hospital, Lenoir told Faber and Phillips

that the Black Disciples were responsible for shooting Robert.  Faber asked Lenoir if he would

drive Phillips and Faber to the Walgreens store near the intersection of Western Avenue and

Madison Street, which Lenoir described as the middle of the Black Disciples' area.  Also, Lenoir

acknowledged that both Faber and Phillips had guns and that Faber wanted to retaliate for

Robert's shooting.  Lenoir agreed to drive Faber and Phillips to the Walgreens store.

Furthermore, Lenoir stated that they drove to the intersection, they picked up McClellan

and that near the intersection Faber saw the victim Wright and asked the group if he was a Black

Disciple.  Lenoir then identified Wright as a Black Disciple.  Thereafter, Lenoir stopped the car

and Faber and Phillips jumped out.  Faber and Phillips reached into their back pockets and

retrieved their guns.  Lenoir stated that Faber then began shooting in Wright's direction and

when Lenoir saw Wright fall, he drove off.  After the shooting, Faber and Phillips ran toward the

car.  In his videotaped statement, Lenoir said that he did not stop the car to let them in.  He further stated that he parked the car at a liquor store and gave the keys to McClellan. A few hours later, he saw Faber and Phillips at St. Stephens Terrace.  Lenoir said Faber and Phillips told him to keep his mouth shut.  Lenoir stated that he agreed to do so because he saw the gun in Faber's back pocket.  The group then separated.

### C.  Jury Note

During jury deliberations, the jury sent a note to the Circuit Court judge asking to see a drawing of the intersection of Western Avenue and Madison Street.  The judge then asked defense counsel whether he wanted to waive Lenoir's appearance for the reading of the note.  Defense counsel agreed to waive Lenoir's appearance.  The parties then agreed that the answer to the note should state "you have all of the exhibits and evidence, continue to deliberate."  The Circuit Court then wrote the note and sent it to the jury.  Thereafter, the jury found Lenoir guilty of first degree murder and attempted first degree murder.

## II.  Procedural Background

After the jury found Lenoir guilty of first degree murder and attempted first degree murder, the Circuit Court sentenced him to consecutive terms of thirty and eighteen years respectively.  On direct appeal to the Illinois Appellate Court, First District, Lenoir argued that the trial court erred by:  (1) denying his motions to quash and suppress his statements; (2) precluding defense counsel from questioning the venire regarding any prejudice about the use of guns; (3) failing to instruct the jury to disregard evidence introduced by the State through improperly worded questions; (4) instructing the jury on the defense of withdrawal; and (5) communicating with the jury outside of his presence.  The Illinois Appellate Court affirmed.

Lenoir then file a petition for leave to appeal ("PLA") to the Supreme Court of Illinois arguing that the trial court erred by: (1) denying his motions to quash and suppress his statements; (2) instructing the jury on the defense of withdrawal; and (3) communicating with the jury outside of his presence. On March 30, 2011, the Supreme Court of Illinois denied Lenoir's PLA. Lenoir did not file a petition for a writ of certiorari to the United States Supreme Court.

On December 15, 2011, Lenoir filed a pro se petition for post-conviction relief in the Circuit Court of Cook County pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1, *et seq.*, raising the following claims: (1) ineffective assistance of trial counsel based on counsel's failure to investigate and call certain witnesses for the suppression hearing regarding his arrest; (2) ineffective assistance of trial counsel based on counsel's failure to call him to testify at the suppression hearing and at trial regarding the police interrogation; and (3) ineffective assistance of appellate counsel for failing to bring a claim that trial counsel was ineffective regarding Phillips' inconsistent trial testimony, among other claims not relevant to the present habeas petition. On March 8, 2012, the Circuit Court of Cook County dismissed Lenoir's post-conviction petition as frivolous and patently without merit. *See* 725 ILCS 5/122–2.1(a)(2). Lenoir appealed.

The Circuit Court judge then appointed a state appellate defender to represent Lenoir on his post-conviction appeal. The state appellate defender moved to withdraw as counsel pursuant to *Pennsylvania v. Finley,* 481 U.S. 551 (1987), arguing that all of the claims Lenoir raised in his pro se post-conviction petition were without merit. The Illinois Appellate Court granted counsel's motion to withdraw, agreed that Lenoir's pro se post-conviction claims were meritless, and affirmed the judgment on June 18, 2013. Lenoir then filed a pro se post-conviction PLA to

the Supreme Court of Illinois arguing that his trial counsel was constitutionally ineffective for (1) failing to investigate and call certain witnesses for the suppression hearing regarding his arrest, and (2) failing to call him to testify at the suppression hearing and at trial concerning the police interrogation. On September 25, 2013, the Supreme Court of Illinois denied Lenoir's post-conviction PLA.

While Lenoir's post-conviction PLA was pending, he filed a pro se motion for leave to file a successive petition for post-conviction relief in the Circuit Court of Cook County on or about August 5, 2013. His successive petition alleges that he is actually innocent based on his coerced confession and that the State knowingly presented the perjured testimony of Detective McDermott, Detective Flaherty, and ASA Gregorovic during the suppression hearing regarding the police interrogation. Also, Lenoir's motion for leave to file a successive petition alleged that his trial counsel was constitutionally ineffective for failing to notify him of a plea offer. The Circuit Court denied Lenoir's motion for leave to file a successive post-conviction petition on December 4, 2013, and Lenoir appealed. That appeal is currently pending in the Illinois Appellate Court.

## III. Habeas Petition

Construing his pro se amended habeas petition liberally, *see Ambrose v. Roeckeman,* 749 F.3d 615, 618 (7th Cir. 2014), Lenoir brings the following claims: (1) the police violated the Fourth Amendment by entering his mother's home when they arrested him; (2) the trial court erred by instructing the jury on the defense of withdrawal depriving him of due process; (3) the trial court violated due process by communicating with the jury outside of his presence; (4) trial counsel was constitutionally ineffective for (a) failing to investigate witnesses for the

suppression hearing regarding his arrest, and (b) failing to call him at the suppression hearing

and at trial concerning the police interrogation; and (5) his appellate counsel was constitutionally

ineffective for failing to bring a claim that trial counsel was ineffective based on Phillips'

inconsistent trial testimony.[2]  Because Lenoir's amended habeas petition does not contain any of

the claims in his successive post-conviction petition pending in the Illinois courts, he has

exhausted all of his habeas claims brought in his amended habeas petition, except for his second

claim, as discussed in detail below.

## LEGAL STANDARDS

**I.      Habeas Relief**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the Court

cannot grant habeas relief unless the state court's decision was contrary to, or an unreasonable

application of federal law clearly established by the Supreme Court.  *See Williams v. Taylor,* 529

U.S. 362, 402-03, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Ruhl v. Hardy,* 743 F.3d 1083, 1091

(7th Cir. 2014).  Clearly established federal law for purposes of § 2254(d)(1) includes only the

holdings, as opposed to dicta, of the United States Supreme Court.  *See White v. Woodall,*

___U.S.___, 134 S.Ct. 1697, 1702, 188 L.Ed.2d 698 (2014).  The Supreme Court has explained

that a state court's decision is "contrary to" clearly established Supreme Court law "if the state

court arrives at a conclusion opposite to that reached by this Court on a question of law" or "if

the state court confronts facts that are materially indistinguishable from a relevant Supreme

---

[2]  Although Lenoir alleges in his habeas petition that Phillips' testimony was perjured, his post-conviction petition states that appellate counsel was ineffective for failing to bring a claim that "Donald Phillip[s] testified inconsistent to his prior statement" and that "Phillip's testimony on the stand at petitioner's trial was inconsistent to his prior video stat[e]ment made to the police."  (R. 33, Ex. Y, Post-Conviction Petition, at 8, Bates C00037.)

Court precedent and arrives at a result opposite to ours." *Williams,* 529 U.S. at 405; *see also Kamlager v. Pollard,* 715 F.3d 1010, 1015 (7th Cir. 2013) ("A state court decision is 'contrary to' federal law if it applies the wrong legal standard established by Supreme Court precedent or decides a case differently than the Supreme Court on materially indistinguishable facts.").

Under AEDPA's "unreasonable application" prong, a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See Williams,* 529 U.S. at 407; *see also White,* 134 S.Ct. at 1702. The state court's application of federal law must be more than incorrect, it must be "objectively unreasonable." *Ford v. Wilson,* 747 F.3d 922, 952 (7th Cir. 2014); *see also Williams*, 529 U.S. at 410 ("*unreasonable* application of federal law is different from an *incorrect* application of federal law") (emphasis in original). To be considered objectively unreasonable, a state court's decision must be "well outside the boundaries of permissible differences of opinion." *Kamlager,* 715 F.3d at 1016 (citation omitted).

## II.    Exhaustion and Procedural Default

"A state petitioner seeking a writ of habeas corpus in federal court must first exhaust the remedies available to him in state court, 28 U.S.C. § 2254(b)(1)(A), 'thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights.'" *Cheeks v. Gaetz,* 571 F.3d 680, 685 (7th Cir. 2009) (citations omitted). In particular, a habeas petitioner must fully and fairly present his federal claims through one full round of state court review before he files his federal habeas petition. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Richardson v. Lemke,* 745 F.3d 258, 268 (7th Cir. 2014). "[W]hen a petitioner has exhausted his state court remedies," but "failed to properly

assert his federal claims at each level of review those claims are procedurally defaulted." *Woods v. Schwartz,* 589 F.3d 368, 373 (7th Cir. 2009). A claim is also procedurally defaulted "when a petitioner fails to raise his federal claims in compliance with relevant state procedural rules," because "the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review." *Cone v. Bell,* 556 U.S. 449, 465, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009). Procedural default precludes federal habeas courts from reviewing the merits of a petitioner's habeas claims. *See Bolton v. Akpore,* 730 F.3d 685, 696 (7th Cir. 2013).

A habeas petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice or by showing that the Court's failure to consider the claim would result in a fundamental miscarriage of justice. *See House v. Bell,* 547 U.S. 518, 536, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). The Supreme Court defines cause sufficient to excuse procedural default as "some objective factor external to the defense" which prevents a petitioner from pursuing his constitutional claim in state court. *See Murray v. Carrier,* 477 U.S. 478, 492, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Weddington v. Zatecky,* 721 F.3d 456, 465 (7th Cir. 2013). Prejudice means actual prejudice infecting the "entire trial with error of constitutional dimensions." *Murray*, 477 U.S. at 494 (citation omitted). A fundamental miscarriage of justice occurs when a habeas petitioner establishes that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 496.

**ANALYSIS**

**I.      Fourth Amendment Claim**

In his first habeas claim, Lenoir maintains that the police violated his Fourth Amendment rights by entering his mother's home without a warrant before they arrested him.  Because Lenoir had an opportunity for full and fair litigation of this issue in the Illinois courts, his habeas claim is foreclosed by *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). More specifically, the Supreme Court in *Stone* held that when a "State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at the trial."  *Id.* at 482; *see also Ben–Yisrayl v. Buss,* 540 F.3d 542, 552 (7th Cir. 2008).  Put differently, *Stone* "bars a federal habeas court from reaching the merits of a petitioner's Fourth Amendment claim so long as the state court granted him a full and fair hearing on the claim."  *Monroe v. Davis,* 712 F.3d 1106, 1112-13 (7th Cir. 2013).  As the Seventh Circuit instructs, "'full and fair' guarantees the right to present one's case, but it does not guarantee a correct result."  *Cabrera v. Hinsley*, 324 F.3d 527, 532 (7th Cir. 2003).  Thus, "absent a subversion of the hearing process, [courts] will not examine whether the state courts made the right decision."  *Ben–Yisrayl*, 540 F.3d at 552.

The state court record establishes that the Illinois courts afforded Lenoir a full and fair opportunity to litigate his Fourth Amendment claim that police lacked authority to enter his mother's home where police arrested him.  In fact, Lenoir presented this claim to three separate levels of review in the Illinois courts: (1) the Circuit Court conducted a hearing on his motion to suppress his statements; (2) he challenged the denial of his motion on appeal before the Illinois

13

Appellate Court, and (3) he brought this claim in his PLA to the Supreme Court of Illinois.

More specifically, at the hearing in the Circuit Court, numerous individuals testified, including individuals who were present at the time of Lenoir's arrest on September 18, 2003. This testimony revealed that Lenoir's mother lived at 2319 West Jackson Boulevard in Chicago. Lenoir's mother testified at the hearing that on September 18, 2003, she was inside her home with about ten family members for a party and that she was upstairs when the police officers entered her home. Other individuals who testified at the suppression hearing stated that they were downstairs and that the police did not show them a warrant for Lenoir's arrest nor did they "knock and announce" prior to entering Cosby's home.

Chicago Police Detective Thomas Flaherty testified that he was working on the investigation of Wright's murder with other officers at Area 4 police headquarters and that on September 18, 2003, another detective informed him that Lenoir's co-defendant McClennan had given a statement implicating Lenoir in Wright's murder. Thereafter, Detective Flaherty testified that he and other police officers went to 2319 West Jackson Boulevard, where Lenoir's mother lived to arrest Lenoir. At that time, the front door of the house was open, but the screen door was closed. Detective Flaherty then testified that he and the other officers walked to the screen door and identified themselves as police officers after which someone from inside said "come on in." That person asked the officers what they wanted, to which Detective Flaherty responded that he was looking for Lenoir. The police officers then arrested Lenoir.

After the hearing, the Circuit Court judge concluded that the police officers properly entered Cosby's home and that they had probable cause to arrest Lenoir. Specifically, the Circuit Court concluded that—after listening to the witnesses and observing their

demeanor—Detective Flaherty's testimony was clear and convincing that the police officers were invited into the home of Lenoir's mother. Based on this full and fair hearing in front of the trial court, Lenoir's Fourth Amendment habeas claim is barred by *Stone*. *See Watson v. Hulick*, 481 F.3d 537, 541-42 (7th Cir. 2007) ("petitioner cannot obtain collateral relief on a Fourth Amendment claim unless the state courts deprived him of a full and fair opportunity to litigate the claim"). The Court therefore denies Lenoir's first habeas claim.

## II.      Due Process Claims

In his amended habeas petition, Lenoir also maintains that the trial court violated his due process rights by instructing the jury on the defense of withdrawal and communicating with the jury outside of his presence. Lenoir, however, has procedurally defaulted both of these due process claims.

### A.      Defense of Withdrawal

First, Lenoir's claim that the trial court violated his due process rights by instructing the jury on the defense of withdrawal is procedurally defaulted because Lenoir did not present this claim as a federal due process claim on direct appeal or in his PLA to the Supreme Court of Illinois. Instead, he raised this claim under state law, namely, that the trial court erred by giving Illinois Pattern Jury Instruction 5.04. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). To clarify, in order to exhaust a federal habeas claim, a habeas petitioner must alert "the state court to the federal nature of the claim and permit that court to adjudicate squarely that federal issue." *Villanueva v. Anglin,* 719 F.3d 769, 775 (7th Cir. 2013) (citation omitted). Here, Lenoir's claim based on Illinois Pattern Jury Instruction 5.04 was

not framed as a federal or due process claim on direct appeal nor in his PLA to the Supreme Court, and thus Lenoir has procedurally defaulted this claim. *See Perruquet v. Briley,* 390 F.3d 505, 514 (7th Cir. 2004) (where a "petitioner has already pursued his state-court remedies and there is no longer any state corrective process available to him, it is not the exhaustion doctrine that stands in the path to habeas relief, but rather the separate but related doctrine of procedural default.") (internal citation omitted).

### B.    Jury Note

Lenoir's second due process claim, namely, that the trial court erred in responding to a jury question in Lenoir's absence is procedurally defaulted because the Illinois Appellate Court rejected this claim on independent and adequate state procedural grounds. *See Lee v. Foster,* 750 F.3d 687, 693 (7th Cir. 2014) (federal habeas courts "will not entertain questions of federal law in a habeas petition when the state procedural ground relied upon in the state court 'is independent of the federal question and adequate to support the judgment.'") (citation omitted). In addressing this argument, the Illinois Appellate Court concluded that Lenoir had forfeited this issue because defense counsel failed to object to the alleged error at trial and failed to raise this error in a timely post-trial motion. *See People v. Lewis,* 234 Ill.2d 32, 40, 332 Ill.Dec. 334 912 N.E.2d 1220 (Ill. 2009) ("Both a contemporaneous objection and a written posttrial motion are required to preserve an issue for review.") (citing *People v. Enoch,* 122 Ill.2d 176, 186, 119 Ill.Dec. 265, 522 N.E.2d 1124 (1988)).  In fact, as the Illinois Appellate Court mentioned, Lenoir's appellate counsel agreed that trial counsel did not object to Lenoir's absence when the trial court read the jury's note and argued that the appellate court should review this claim under the plain error standard.

The Illinois court's decision is independent of the underlying question because the court did not address whether it was error for the trial court to communicate with the jury under the circumstances, but instead, applied Illinois' well-established forfeiture rule.  *See Szabo v. Walls,* 313 F.3d 392, 395 (7th Cir. 2002).  Also, the decision was adequate because Illinois' forfeiture rule is firmly established and Illinois courts regularly follow it.  *See Whitehead v. Cowan,* 263 F.3d 708, 726-27 (7th Cir. 2001); *see, e.g., People v. Sharp,* ___ N.E.2d ___, 2015 WL 270054, at *10 (1st Dist. Jan. 21, 2015).  Accordingly, Lenoir has procedurally defaulted this habeas claim.

### C.      Exceptions to Procedural Default

Because Lenoir procedurally defaulted his due process claims, he must provide an exception to the default before the Court will consider the merits of his claims.  *See Bolton,* 730 F.3d at 696.

### 1.      Actual Innocence

In his motion to amend his habeas petition and in his successive post-conviction petition, Lenoir argues that he is actually innocent, which goes to the fundamental miscarriage of justice exception to procedural default.  Actual innocence or "the fundamental miscarriage of justice exception, is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons."  *Herrera v. Collins,* 506 U.S. 390, 404-05, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).  As the Supreme Court teaches, "tenable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  *McQuiggin*

*v. Perkins,* ___ U.S. ___, 133 S.Ct. 1924, 1928, 185 L.Ed.2d 1019 (2013) (quoting *Schlup v. Delo,* 513 U.S. 298, 329, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)).  In other words, "[t]o establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup,* 513 U.S. at 327.  This new, reliable evidence may include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *House,* 547 U.S. at 537 (citation omitted).  More specifically, "[t]o demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim." *Hayes v. Battaglia,* 403 F.3d 935, 938 (7th Cir. 2005).  When deciding the issue of actual innocence, "the habeas court must consider all the evidence, old and new, incriminating and exculpatory" to "make a probabilistic determination about what reasonable, properly instructed jurors would do." *House,* 547 U.S. at 538.

In his successive post-conviction petition, Lenoir maintains that he has new evidence not presented at trial, namely, the July 19, 2006, Report of the Special State's Attorney, and that this report supports his claim that police officers subjected him to mental and physical abuse during his interrogation in September 2003.  Lenoir asserts the following facts regarding his September 2003 interrogation.  First, Lenoir explains that after he was arrested, police took him to Area 4 police station and Detective Flaherty and an unidentified police officer handcuffed him to a ring on the wall in the interrogation room.  (Ex. BB, Successive Post Conviction Petition, at Bates C00036.)  Thereafter, Detective McDermott denied his request for an attorney.  (*Id.* at C00037.)

Lenoir further explains that at some point an unidentified police officer made him take off his pants and shirt and that he remained handcuffed without clothing for several hours. (*Id.*) According to Lenoir, another unnamed police officer came into the interrogation room and repeatedly hit him with a phone book.

The portion of the 2006 report that Lenoir relies upon to establish his actual innocence involves the case of Alfonzo Pinex. Specifically, the report indicates that there was sufficient evidence to support an indictment of Detective McDermott for aggravated battery, perjury, and the obstruction of justice in relation to coercing Pinex's confession in June 1985 based on Detective McDermott and another detective beating Pinex until he confessed to a murder. This new evidence is not substantive, exculpatory evidence, namely, evidence of Lenoir's factual innocence, but instead undermines Detective McDermott's credibility when he testified at the second suppression hearing regarding Lenoir's interrogation and confession. This impeachment evidence does not provide a basis to establish Lenoir's actual innocence because it is "a step removed from evidence pertaining to the crime itself." *Calderon v. Thompson,* 523 U.S. 538, 563, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998); *see also Bousley v. United States,* 523 U.S. 614, 623-624, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) ("'actual innocence' means factual innocence, not mere legal insufficiency"); *see, e.g., Nitz v. Anglin,* No. 11 C 1904, 2014 WL 831610, at *18 (N.D. Ill. Mar. 4, 2014).

Moreover, Lenoir has failed to show that it is more likely than not that no reasonable juror would convict him in light of this new impeachment evidence. *See Schlup,* 513 U.S. at 327. Put differently, a reasonable, properly instructed jury could have convicted Lenoir based on the evidence presented at trial without Lenoir's videotaped confession. Specifically, Lenoir's

co-defendant Phillips testified to the details of Wright's murder implicating Lenoir and this evidence was corroborated by the other victim's testimony and Detective Flaherty's testimony regarding his investigation into Wright's murder. In sum, this new impeachment evidence "does not seriously call into doubt the core of the [S]tate's case." *See Whitlock v. Godinez,* 51 F.3d 59, 64 (7th Cir. 1995). Accordingly, Lenoir has failed to establish his actual innocence as a gateway for the Court to consider the merits of his due process claim.

### 2. Cause and Prejudice

Moreover, Lenoir has failed to argue, let alone establish, that there was "some objective factor external to the defense" that prevented him from pursuing his constitutional claims in state court, along with the requisite prejudice. *See Weddington,* 721 F.3d at 465. Although well-preserved, meritorious claims of ineffective assistance of counsel may excuse procedural default, as discussed below, Lenoir's ineffective assistance of trial claims are without merit and he procedurally defaulted his ineffective assistance of appellate counsel claim. *See Bolton,* 730 F.3d at 696-97; *Promotor v. Pollard,* 628 F.3d 878, 887 (7th Cir. 2010). As such, Petitioner has failed to provide an exception to his procedurally defaulted claims.

## III. Ineffective Assistance of Trial Counsel Claims

As mentioned, Lenoir asserts that his trial counsel was constitutionally ineffective for (1) failing to investigate witnesses for the first suppression hearing regarding his arrest, and (2) failing to call him to testify at the second suppression hearing and at trial in relation to the police interrogation. To establish constitutionally ineffective assistance of trial counsel under the Sixth Amendment, Lenoir must show that (1) his trial attorney's performance "fell below an objective standard of reasonableness," informed by "prevailing professional norms" and (2) "but for

counsel's unprofessional errors the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "To reflect the wide range of competent legal strategies and to avoid the pitfalls of review in hindsight, [the Court's] review of an attorney's performance is highly deferential and reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Groves v. United States,* 755 F.3d 588, 591 (7th Cir. 2014) (citation omitted). To establish prejudice, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding," instead trial counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Morgan v. Hardy,* 662 F.3d 790, 802 (7th Cir. 2011) (quoting *Strickland*, 466 U.S. at 687, 693). If Lenoir fails to make a proper showing under one of the *Strickland* prongs, the Court need not consider the other. *See id.* at 697 ("a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant"). Finally, as the Supreme Court teaches, because the "standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" when applying "the two in tandem, review is 'doubly so.'" *Harrington v. Richter,* 562 U.S. 86, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011).

Because the last state court to consider Lenoir's ineffective assistance of trial counsel claims on the merits was the Circuit Court of Cook County when it dismissed Lenoir's post-conviction petition as frivolous and patently without merit on March 8, 2012, the Court turns to the Circuit Court's decision in assessing these claims. *See Campbell v. Smith,* 770 F.3d 540, 546 (7th Cir. 2014). In its March 8, 2012, Order, the Circuit Court—in the context of Lenoir's ineffective assistance claim regarding the first suppression hearing— reasoned as follows:

> In the instant case, petitioner claims that counsel was ineffective for failing to investigate several witnesses who could have testified at his suppression hearing regarding the police officer's failure to comply with the "knock and announce" rule.....  Petitioner claims counsel should have interviewed and called Chara Miller, Kimberly Johnson, Juanita Faulkner, and Chenice Cathery.  Each witness states that the police did not knock on the door but simply ran into the house located at 2319 W. Jackson without consent.  However, at petitioner's suppression hearing, Steven Kyles, Ray Rubisteen, and Linda Cosby all testified to this exact information.  Therefore, the testimony of these other witnesses is cumulative and counsel was not ineffective for failing to call them.

(Ex. Y, 3/8/12 Order, at 10-11, Bates C00129-30.)

The Illinois Circuit Court's reasoning is objectively reasonable and well within the boundaries of permissible differences of opinion.  *See Kamlager,* 715 F.3d at 1016.  It was sound strategy that trial counsel did not call these additional four witnesses to give the same testimony as the other three witnesses.  *See, e.g., Smith v. Lane,* 794 F.2d 287, 292-93 (7th Cir. 1986). Thus, Lenoir cannot establish that his trial counsel's performance was constitutionally deficient under the first prong of the *Strickland* standard, especially in light of the strong presumption that counsel's performance falls within the wide range of reasonable professional assistance.  *See Johnson v. Thurmer,* 624 F.3d 786, 792 (7th Cir. 2010) ("It is well established that [the court's] scrutiny of counsel's trial strategy is to be deferential and that we do not second guess the reasonable tactical decisions of counsel in assessing whether his performance was deficient."). Hence, Lenoir's first ineffective assistance of trial counsel claim fails.

Next, Lenoir maintains that counsel was constitutionally ineffective for not calling him to testify at the second suppression hearing and at trial concerning the police interrogation.  In his affidavit in support of his post-conviction petition dated February 27, 2012, Lenoir averred that he advised his trial lawyer before and during the motion hearing that he wanted to testify to dispute the State's evidence.  (Ex. Y, Lenoir Aff. ¶¶ 2, 3, Bates C00116-17.)  Lenoir further

avers that his trial counsel told him she was not going to call him to testify explaining that she had worked with the Circuit Court judge for a number of years and knows how he thinks. (*Id.* ¶ 6.) According to Lenoir's affidavit, counsel further stated that the judge rarely granted this type of motion to suppress, that Lenoir's testimony could hurt him, and that it was not worth him testifying. (*Id.* ¶¶ 7, 8.)

In denying this ineffective assistance claim, the post-conviction Circuit Court recognized the difficulty that reviewing courts have when assessing whether trial counsel has interfered with a defendant's right to testify. Nonetheless, under the circumstances and in light of the fact that Lenoir's affidavit was not notarized (or signed under penalty of perjury), the post-conviction judge—the same judge who tried Lenoir's jury trial—concluded that "[b]ased on the record, this advice was not unreasonable and petitioner informed the court that he was waiving his right to testify and that he understood it was his right to do so regardless of what his attorney's advice might be." (Ex. Y, 3/8/12 Order, at 13, Bates C00132.)

Lenoir has failed to establish that the Circuit Court's application of *Strickland* to this ineffective assistance of counsel claim was objectively unreasonable, namely, that there is no reasonable basis for its decision. *See Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388, 1402, 179 L.Ed.2d 557 (2011). Not only does the Circuit Court conclude that counsel's performance fulfilled the *Strickland* performance prong based on the record before the court, but the judge further recognized that Lenoir unequivocally waived his right to testify at the suppression hearing and at trial. Accordingly, Lenoir's second ineffective assistance of trial counsel claim is without merit.

## IV.     Ineffective Assistance of Appellate Counsel Claim

Lenoir also argues that his appellate counsel provided constitutionally ineffective assistance of counsel for failing to bring a claim that trial counsel was ineffective based on Phillips' inconsistent trial testimony.  Lenoir, however, has procedurally defaulted this claim because he failed to present this claim through on full round of state court review.  *See Boerckel,* 526 U.S. at 845, 848; *Richardson,* 745 F.3d at 268.  In particular, although Lenoir brought this claim in his post-conviction petition, he did not bring it in response to appointed counsel's *Finley* motion on post-conviction appeal nor in his PLA to the Supreme Court of Illinois.  And, as discussed above, Lenoir has failed to offer any exceptions to his procedural default.  The Court therefore denies Lenoir's ineffective assistance of appellate counsel claim.

## V.     Certificate of Appealability

Under the 2009 Amendments to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Accordingly, the Court must determine whether to grant Lenoir a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2) in the present order.  *See Gonzalez v. Thaler,* ___ U.S. ___, 132 S.Ct. 641, 649 n.5, 181 L.Ed.2d 619 (2012).

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition, instead, he must first request a certificate of appealability.  *See Miller-El v. Cockrell,* 537 U.S. 322, 335, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003).  Moreover, a habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right.  *See Miller-El,* 537 U.S. at 336; *Thomas v. Zatecky,* 712 F.3d 1004, 1006 (7th Cir. 2013); 28 U.S.C. § 2253(c)(2).  Under this standard, Lenoir must

demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El,* 537 U.S. at 336 (quoting *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)).

Lenoir has failed to show a substantial showing of the denial of a constitutional right because he has not sufficiently explained why jurists of reason would debate that the Court should have resolved the present habeas petition in a different manner. *See Peterson v. Douma,* 751 F.3d 524, 528 (7th Cir. 2014). Therefore, the Court declines to certify any issues for appeal. *See* 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For these reasons, the Court denies Lenoir's petition for a writ of habeas corpus and declines to certify any issues for appeal. *See* 28 U.S.C. §§ 2253(c)(2), 2254(d).

**Dated:** February 17, 2015

ENTERED

**AMY J. ST. EVE**
**United States District Judge**